IN RE DAVID W.*
(AC 17313)
(AC 17564)

Schaller, Sullivan and Shea, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued September 30, 1998—officially released April 6, 1999

*William R. Kinloch*, with whom, on the brief, was *Margaret B. Moser*, for the appellant (respondent father).

*Bradford J. Chaucer*, for the appellant (respondent mother).

*Bette L. Paul*, assistant attorney general, with whom, on the brief, was *Richard Blumenthal*, attorney general, for the appellee (petitioner).

*Valerie B. Denyer*, for the minor child.

*Opinion*

SHEA, J. In this proceeding for termination of the parental rights of the respondents with respect to their son, David, both the father (AC 17313) and the mother

(AC 17564) have appealed from the judgment of the trial court granting the petition of the commissioner of children and families (commissioner) seeking such termination. The trial court relied on two of the grounds for terminating parental rights set forth in General Statutes (Rev. to 1995) § 17a-112 (b):[1] "(2) the parent of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child,

---

[1] General Statutes (Rev. to 1995) § 17a-112 (b), as amended by Public Acts 1995, No. 95-238, provides: "The superior court upon hearing and notice, as provided in sections 45a-716 and 45a-717, may grant such petition if it finds that the department of children and families has made reasonable efforts to reunify the child with the parent and, upon clear and convincing evidence, that the termination is in the best interest of the child and that, with respect to any consenting parent, such parent has voluntarily and knowingly consented to termination of his parental rights with respect to such child or that, with respect to any nonconsenting parent, over an extended period of time, which, except as provided in subsection (c) of this section, shall not be less than one year: (1) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child; or (2) the parent of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child; or (3) the child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being. Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights; or (4) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child. The requirement that the department of children and families has made reasonable efforts to reunify the child with the parent shall not apply to terminations of parental rights based on consent or terminations of parental rights where such reasonable efforts at reunification were not possible. If the court denies a petition for

such parent could assume a responsible position in the life of the child; [and] (3) the child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being. Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights . . . ."

In seeking to reverse the judgment, the respondents contend that (1) the doctrine of res judicata bars reliance on General Statutes (Rev. to 1995) § 17a-112 (b) (2), which requires a prior adjudication that a child has been neglected or uncared for, (2) the petitioner was estopped from claiming that the respondents had not achieved a sufficient degree of rehabilitation to resume their parental roles because certain employees of the department had assured them that their progress toward reunification with their child had been good and (3) the trial court should have stricken the testimony of a psychologist who had been appointed by the court to evaluate the rehabilitation progress of the parents because he had also been contacted by counsel for the department to testify as its expert witness concerning the rehabilitation of the parents. We conclude that there is no merit in the claim of res judicata and that the claimed misrepresentations made to the parents had no impact on the judgment, but that the motion to strike the testimony of the psychologist should have been granted because of his agreement to act as an expert witness for the department of children and families (department) after he had been appointed by the trial court to evaluate the parents and because of his ex parte contacts with counsel for the department.

consent termination of parental rights, it may refer the matter to an agency to assess the needs of the child, the care the child is receiving, and the plan of the parent for the child."

The facts found by the trial court as recited in the memorandum of decision are unchallenged. The child was born to the respondents on July 12, 1993. He was born three months premature, weighing only three pounds, nine ounces, and remained in the hospital for eighteen days. He was discharged on August 1, 1993, and lived with his parents until September 5, 1993. On that date, he was brought to a hospital after having sustained multiple life threatening injuries: four fractures of the left ribs; a fracture showing interval healing of the right femur; a spiral fracture of the left femur; a distal fracture of the left femur, which appeared to have healed; two recent fractures of the right tibia and fibula; a collapsed lung and multiple bruises and petechiae on the face, neck and chest, probably caused by the child's screaming in pain according to the testimony of a physician. The parents had exclusive control and custody of the child immediately preceding his injuries. They offered no reasonable explanation for the injuries sustained by their child.

On September 8, 1993, the child was discharged from the hospital and placed in the care of the department, which obtained an order of temporary custody on the same date. After a study by the department foster care unit, he was placed with a couple known to the respondents. The child has resided with the couple since December 24, 1993, but the respondents have visited him, as permitted by the department, since that time, either at their home or at the home of the foster parents. On January 11, 1994, the respondents pleaded nolo contendere to the neglect petition that the commissioner had filed. The court, *Barnett, J.*, adjudicated the child to be a neglected child pursuant to General Statutes (Rev. to 1993) § 46b-129 (d)[2] and committed him to the commissioner in accordance with that statute.

---

[2] General Statutes (Rev. to 1993) § 46b-129 (d), as amended by Public Acts 1993, No. 93-91, provides in relevant part: "Upon finding and adjudging that

As mandated by General Statutes (Rev. to 1995) § 17a-112 (d),[3] the trial court also made findings regarding the services provided by the department to facilitate reunion of the child with the parents and other related matters specified in that statute. No issue has been raised about the sufficiency of the evidence to support those findings or compliance of the findings with the

any child or youth is uncared-for, neglected or dependent, the court may commit him to the commissioner of children and families for a maximum period of eighteen months, unless such period is extended in accordance with the provisions of subsection (e) of this section, provided such commitment or any extension thereof may be revoked or parental rights terminated at any time by the court, or the court may vest such child's or youth's care and personal custody in any private or public agency which is permitted by law to care for neglected, uncared-for or dependent children or youth or with any person found to be suitable and worthy of such responsibility by the court. . . ."

[3] General Statutes (Rev. to 1995) § 17a-112 (d), as amended by Public Acts 1995, No. 95-238, provides: "Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the department of children and families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

statute as a prerequisite for the judgment of termination.

I

The respondents argue that res judicata requires reversal of the judgment of the trial court terminating their parental rights because of the failure of the commissioner to seek such termination in the neglect proceeding in which the commissioner sought custody of the child after learning of the injuries he had sustained while living with his parents. "[C]laim preclusion [or res judicata] prevents a litigant from reasserting a claim that has already been decided on the merits. . . . Under claim preclusion analysis, a claim—that is, a cause of action—includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose. . . . Moreover, claim preclusion prevents the pursuit of any claims relating to the cause of action which were actually made or might have been made." (Citations omitted; internal quotation marks omitted.) *Scalzo* v. *Danbury*, 224 Conn. 124, 127–28, 617 A.2d 440 (1992). "The doctrines of preclusion, however, should be flexible and must give way when their mechanical application would frustrate other social policies based on values equally or more important than the convenience afforded by finality in legal controversies." *In re Juvenile Appeal (83-DE)*, 190 Conn. 310, 318, 460 A.2d 1277 (1983).

The legislative goal of reuniting a neglected child with its parents, when feasible, would be seriously undermined by allowing the judgment transferring custody to the commissioner in a neglect proceeding to bar a subsequent petition for termination of parental rights, even though the neglect adjudication constitutes part of the ground for termination set forth in § 17a-112 (b) (2). That subsection refers explicitly to "the

parent of a child who has been found by the superior court to have been neglected or uncared for *in a prior proceeding . . . .*" (Emphasis added.) General Statutes (Rev. to 1995) § 17a-112 (b) (2). The statute further requires that the parent of such a child be found to have "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." General Statutes (Rev. to 1995) § 17a-112 (b) (2). Furthermore, "[e]xcept in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent . . . [and] (6) the efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future . . . ." General Statutes (Rev. to 1995) § 17a-112 (d).

Although General Statutes (Rev. to 1995) § 17a-112 (e)[1] does provide that a neglect petition "may be accompanied by or, upon motion by the petitioner, consolidated with a petition for termination of parental rights," that procedure is not mandatory but optional on the

[1] General Statutes (Rev. to 1995) § 17a-112 (e) provides: "Any petition brought by the commissioner of children and families to the superior court, pursuant to subsection (a) of section 46b-129, may be accompanied by or, upon motion by the petitioner, consolidated with a petition for termination of parental rights filed in accordance with this section with respect to such child, notwithstanding that such child has not been committed to the commissioner of children and families. Notice of the hearing on such petitions shall be given in accordance with sections 45a-716 and 45a-717. The superior court, after hearing, in accordance with the provisions of subsection (b) of this section, may, in lieu of granting the petition filed pursuant to section 46b-129, grant the petition for termination of parental rights as provided in section 45a-717."

part of the commissioner. When § 17a-112 (b) (2) is the ground for termination, the requirement that the adjudication of neglect occur "in a prior proceeding" indicates that the termination proceeding may not be combined with the neglect proceeding and that separate judgments on each petition are necessary. The mandatory findings required by § 17a-112 (d) concerning the services to be provided to the parent of a child found to have been neglected and the efforts of such a parent to adjust his conduct so that reunification with the child might be achieved could not be made unless there was sufficient time between the judgment on the neglect petition and the hearing on the termination petition to make the studies needed to present the evidence for the prescribed findings. We conclude that, because our statutes require those findings, there must be a sufficient hiatus for that purpose between the adjudications of neglect and termination petitions and, accordingly, the termination judgment in this case is not barred by the prior judgment on the neglect petition. Each petition pertains to a separate transaction and, therefore, the doctrine of res judicata is not applicable. See *Duhaime* v. *American Reserve Life Ins. Co.*, 200 Conn. 360, 364–65, 511 A.2d 333 (1986).

## II

The respondents next claim that the commissioner should be estopped from maintaining that they had not made sufficient progress in achieving rehabilitation toward the goal of reunification with their child because of statements made by employees of the department to the respondents that their progress toward that goal was good. We conclude that there was a lack of candor on the part of the department, but that the misrepresentations made to the respondents concerning their rehabilitation had no adverse impact on the respondents or on the judgment.

The initial case review in October, 1993, after the child had been released from the hospital and placed in a foster home, indicated that the placement goal of the department was reunification within twelve to eighteen months. In successive six month reviews, the goal of reunification remained unchanged and the progress of the respondents toward that goal was reported as good. The caseworker assigned to the respondents testified, however, that in March, 1995, more than two years after the judgment on the neglect petition, the commissioner decided to seek termination of the respondents' parental rights. She believed that the attorney for the respondents was informed of that decision during a court proceeding that took place about that time. A detailed case study report recommending termination and signed by four employees of the department was completed on November 1, 1995. The petition for termination of the respondents' parental rights was filed on November 3, 1995. Even after the petition had been filed, the six month case reviews nevertheless continued to indicate that the goal was rehabilitation and that the respondents' progress was good. In response to an inquiry on cross-examination as to why the department continued to indicate reunification as the goal when the commissioner had already decided to file a termination petition, the social worker assigned to the case testified that it was the department's policy not to change the reunification goal even after a decision to file a termination petition had been reached, as long as therapy was still being offered by the department. She admitted that she had told the respondents that they were doing what they were supposed to do with respect to rehabilitation therapy.

The respondents claim that the doctrine of promissory estoppel is applicable because of the assurances they received from employees of the department concerning their progress in rehabilitation therapy toward

ultimate reunification with their son. "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." 1 Restatement (Second), Contracts § 90 (1981). "A fundamental element of promissory estoppel, therefore, is the existence of a clear and definite promise which a promisor could reasonably have expected to induce reliance." *D'Ulisse-Cupo* v. *Board of Directors of Notre Dame High School,* 202 Conn. 206, 213, 520 A.2d 217 (1987). The statements of the employees of the department to the respondents concerning their rehabilitation progress can hardly constitute promises because no performance by the promisor is implicated. The trial court was not compelled to conclude that those few words of encouragement would qualify as a clear and definite promise on which the respondents would reasonably be expected to rely with respect to the return of their child.

Although the respondents have not raised a claim of equitable estoppel, it is appropriate to address it in the present case because of the close relationship between promissory and equitable estoppel. The absence of a clear and definite promise would not preclude application of the doctrine of equitable estoppel, but its two essential elements must be proved: "the party against whom estoppel is claimed must do or say something calculated or intended to induce another to believe that certain facts exist and to act on that belief; and the other party must change its position in reliance on those facts, thereby incurring some injury." *Zoning Commission* v. *Lescynski,* 188 Conn. 724, 731, 453 A.2d 1144 (1982). The statements made to the respondents that their progress in therapy was good, encouraging them to continue attending the therapy sessions, might arguably satisfy the first element, but there is no basis in the

evidence for concluding that they suffered any detriment therefrom, as the second element requires. The trial court found that they had attained a degree of personal rehabilitation that was "personally beneficial and encouraging to them individually and collectively." The trial court also acknowledged "impressive rehabilitation by the parents that has tremendously improved their personal and marital prospects." The memorandum of decision states that "the couple has made excellent progress in all areas but one, acknowledgment and acceptance of personal responsibility for causing multiple, serious life threatening injuries to their own infant child." There is no evidence that the therapy that the respondents received was harmful in any manner.

It must be remembered that the petitioner in this case is the commissioner of an agency of the state of Connecticut. "[E]stoppel against a public agency is limited and may be invoked: (1) only with great caution; (2) only when the action in question has been induced by an agent having authority in such matters; and (3) only when special circumstances make it highly inequitable or oppressive not to estop the agency." *Kimberly-Clark Corp.* v. *Dubno*, 204 Conn. 137, 148, 527 A.2d 679 (1987). The respondents could not have reasonably assumed that the employee of the department who told them that their progress in rehabilitation was good had the authority to make the ultimate determination of whether they would likely achieve a degree of rehabilitation sufficient to warrant return of their child. The statements claimed as misrepresentations may well have encouraged the respondents to continue their course of therapy, from which they have benefited significantly, as the trial court found. We conclude that the trial court properly rejected the respondents' claim of estoppel.

### III

Before the trial of the present case, the trial court appointed a clinical psychologist to evaluate the suit-

ability of the respondents as parents in the event that their child was returned to them. The appointment was made pursuant to an agreement of the parties. The psychologist testified that someone on whom the parties had agreed informed him of his appointment. See Practice Book § 25-33, which became effective October 1, 1997, after the trial of this case.

On cross-examination, the psychologist testified that he was contacted by an assistant attorney general, who asked him to meet with her to review the case, and he did so. She asked him to do a developmental assessment and a home study. A social worker called him and requested that he do the follow-up developmentals and collateral contacts. The psychologist testified that each time he was contacted he was told whether he was working for the court or for some other party. He admitted that, with respect to at least one of the evaluations he had made, he knew he was not acting as a court-ordered evaluator. He also testified that he was told not to talk to other counsel without direction from the assistant attorney general and that he may have refused to talk with counsel for the respondents without such consent.

Counsel for the respondent father[5] moved to strike the psychologist's testimony on the ground that he could not simultaneously purport to be a neutral court-appointed witness and also serve as an expert witness on behalf of the department. The trial court denied the motion, ruling that the psychologist's agreement to

[5] The attorney for the respondent mother did not join in the motion to strike the psychologist's testimony nor does her brief raise the denial of that motion as a ground for a new trial. Nevertheless, our order for a new trial because of the denial of that motion applies to the respondent mother as well as the respondent father. They were both adversely affected by the ruling that we conclude was incorrect. Neither the father nor the mother sought to retain parental rights apart from the other. It would be incongruous to order a new trial for the father only.

serve as an expert witness for the department after his appointment by the trial court might affect the weight of his testimony but not its admissibility.

"A basic purpose of appointing an expert is to provide the trier of fact with a neutral viewpoint when the parties' experts are in conflict." 29 C. Wright & V. Gold, Federal Practice and Procedure (1997) § 6305, p. 482. "An expert witness appointed by the trial court to obtain disinterested and unbiased testimony, either under statute or pursuant to its inherent power, is an officer of the court and does not appear as the witness of either party." 31A Am. Jur. 2d, Expert and Opinion Evidence § 16 (1989); *United States* v. *Theriault*, 440 F.2d 713, 715 (5th Cir. 1971). "Fairness requires that the examining psychiatrist pursuant to a § 4244 motion [to determine competency of a defendant to stand trial] be an officer of the Court and responsible neither to the defense nor the prosecution." *United States* v. *Pogany*, 465 F.2d 72, 78 (3d Cir. 1972). Even the court should refrain from ex parte contact with an expert it has appointed to serve as a neutral witness.[6] *United States* v. *Green*, 544 F.2d 138, 146 n.16 (3d Cir. 1976), cert. denied sub nom. *Tefsa* v. *United States*, 430 U.S. 910, 97 S. Ct. 1185, 51 L. Ed. 2d 588 (1977).

If obtaining impartial expert testimony was the purpose for appointing the psychologist who testified for the department in this case as the court's expert witness, that objective plainly was not achieved. Unauthorized ex parte communications with a court-appointed

---

[6] Rule 706 (a) of the Federal Rules of Evidence provides that an expert witness appointed by the court "shall be informed of the witness' duties by the court in writing, a copy of which shall be filed with the clerk, or at a conference in which the parties shall have opportunity to participate. . . ." The record in this appeal does not reveal what instructions the psychologist appointed by the court received concerning his duties. Practice Book § 25-33, which requires an expert witness appointed by the court to be informed of his duties by the court either in writing or at a conference in which the parties have a right to participate, did not become effective until after the trial of the present case.

witness, such as those that took place with an assistant attorney general acting on behalf of the department, are improper. The refusal of the supposedly neutral expert to talk to counsel for the respondent, in contrast to his willingness to confer with the attorney for the department, indicates that he was wholly unaware of his obligations as a court-appointed expert. His agreement to testify on behalf of the department after his appointment as the court's expert was plainly in conflict with the neutral role he necessarily assumed when he accepted that appointment. We conclude that the court should have granted the motion to strike the testimony of its appointed expert because of the conflict created by his agreement to testify on behalf of the department and also because of the ex parte contacts with counsel for the department.

The denial of the motion cannot be regarded as a harmless error, as the dissenting opinion contends. The memorandum of decision indicates that the trial court relied substantially on the testimony of its appointed expert in deciding that the respondents' parental rights should be terminated. The experts who testified on behalf of the respondents, a licensed marriage and family therapist and a clinical psychologist, opined that more time should be allowed for reunification, which could be accomplished by increasing visitation gradually.

The judgment is reversed and the case is remanded for a new trial.

In this opinion SULLIVAN, J., concurred.

SCHALLER, J., dissenting. The majority holds that the trial court improperly refused to strike the testimony of David Mantell, the court-appointed expert witness, in its entirety because, after fulfilling his appointment as a court-appointed expert in this case for nearly two years, he had an ex parte communication with the department of children and families (department) and

accepted an assignment to evaluate the child for the department. The majority reverses the judgment and remands the case for a new trial.[1] The respondent mother, who was separately represented and has also appealed, did not join in moving to strike Mantell's testimony and has not raised this issue on appeal.

In reversing, the majority grounds its decision on the "conflict created by [Mantell's] agreement to testify on behalf of the department and also because of the ex parte contacts with counsel for the department." The majority applies a rule of absolute exclusion of Mantell's testimony because of the apparent compromise of his duty of neutrality.

I conclude that no authority exists for the application of this rule of exclusion in the case of a court-appointed witness. Accordingly, I believe that the trial court correctly held that the remedy for a party who claims that an ex parte communication has compromised a court-appointed witness' neutrality is, in essence, to impeach the witness in order to affect the weight and credibility to be given to the witness' testimony by the trier of fact. Accordingly, I respectfully dissent on the basis of my disagreement, not with the determination of impropriety,[2] but, rather, with the remedy that the majority applies to Mantell's conduct.

[1] No motion was made by the respondent father, however, to strike Mantell's four reports, which were prepared over a period of nearly three years and admitted into evidence without objection. Therefore, no ruling is made with respect to that evidence.

[2] Although, as the majority acknowledges, the record does not reveal that Mantell received any instructions from the court upon his appointment, I agree that it was inconsistent with the duty of neutrality for Mantell to undertake an assignment concerning the child from the assistant attorney general. Whether it was improper to have any ex parte contact under any circumstances is not certain. Even under rule 706 of the Federal Rules of Evidence, it is evident that some courts permit ex parte contact by the parties with such a witness. J. Cecil & T. Willging, "Court-Appointed Experts," Reference Manual on Scientific Evidence (1995) 525, 551. For example, in *Imazio Nursery, Inc.* v. *Dania Greenhouses*, United States

Several additional facts are relevant to a full discussion of the respondents' claim. Mantell, a clinical psychologist, was appointed by the trial court sometime before November, 1993, as a court-ordered evaluator. Specifically, he was asked "to see a group of four adults and one child, perform psychological assessments and offer an opinion about the psychological character restrictions of the people involved in connection with an infant that had been seriously injured multiple times in order to assist the [department] and the court with the major child protection issue, which was where would it be safe for this child to live and did any of the four adults possess characteristics that potentially endangered the child." Mantell "received a package of materials from the court, and it consisted of the evaluation order, a motion for evaluation by agreement of the parties, the petition, the summary of facts and the social study." When asked, "Who contacts you [in such cases]?" Mantell responded: "Well, usually it's the court service officer. Sometimes it's the social worker. On rare occasions, it's the attorney. On rare occasions it's the attorney general. But whoever does it, it's the person that's agreed upon is going to do the job of contacting the evaluator who's to do the court-ordered study and to inform that person that that person has been asked to do this." The record does not reveal who made the contact in this case or whether any instructions were given to Mantell. In carrying out his duties, Mantell prepared four reports. The reports were dated November 27, 1993, March 7, 1994, July 17, 1995, and February 26, 1996. Three of the reports preceded the ex parte contact. All four reports were introduced into evidence without objection and no motion to strike the reports was made by either of the respondents.

District Court for the Northern District of California, Docket No. 92-20755 (April 16, 1997) (1997 WL 195434), the District Court specifically permitted ex parte communications with its court-appointed expert on the part of the parties and the court.

In September, 1995, Bette Paul, the assistant attorney general assigned to the case, contacted Mantell and asked him to meet with her to review the case. In Mantell's words, he was "contacted by the attorney general and asked to do a developmental assessment [of the child]. It was the attorney general who called and asked me to do the home study. It was the social worker who called and asked me to do the follow-up developmentals and collateral contacts." No evidence was produced to indicate that the communication with either person extended beyond those requests or that there were any meetings or conversations that extended beyond conveying the requests. Mantell knew that in at least one of these evaluations, January, 1996, he was not a court-ordered evaluator. In response to the request for an evaluation, Mantell prepared a developmental assessment dated January 23, 1996. That report was marked as an exhibit for identification purposes only. It is noteworthy that, at some unidentified time, Mantell received a request for information from counsel for the respondent father. According to Mantell, this occurred during a different case on which both were working. When Mantell was asked whether he indicated to counsel that he would speak to him only if he had the consent of the attorney general, Mantell replied that he did not recall but stated, "It's something that I could have said." Mantell was not asked whether, in fact, he did speak with the respondent father's counsel or whether he had a conversation with the assistant attorney general or social worker about counsel's request.

The ex parte contact with the department was brought out during Mantell's direct examination. No objection or motion to strike was made by respondents' counsel during direct examination. During cross-examination by the respondent father's counsel, after several questions concerning the the department contact, the respondent father moved to strike Mantell's testimony

on the ground that "he cannot simultaneously be a neutral person who works for the court and also a witness who works for the state." The trial court denied the motion, ruling that "that goes to the weight of his testimony." After the ruling, on cross-examination, Mantell explained his understanding of the dual roles and the method of impeaching a witness in his position.[3] The trial court, in its memorandum of decision, referred to Mantell's various reports in evidence and specifically adopted Mantell's observations concerning the failure of both respondent parents to acknowledge and to accept personal responsibility for causing multiple, serious life threatening injuries to their own infant child.

---

[3] "[Respondent Father's Counsel]: So when you were talking before that unlike the hired gun we're going to be bringing in, you can be trusted because you work for the court, that's only true in part of the case?

"[Mantell]: I don't think I used that language.

"Q. No, you didn't. I'm sorry.

"A. I don't think I made any reference to a hired gun who was more trustworthy.

"Q. I think that you called somebody working for the court more trustworthy than someone hired by the parties because there is no specific ax to grind.

"A. No, I said that's an issue that should or could be considered.

"Q. So then the court can also consider that you work part time for the state's attorney in this case?

"A. I think that the court can ask itself is there any reason to have less faith in the later work that I did when the attorney general's office asked me to follow up on the child than it does in the other work that I was asked to do that preceded those requests that had to do with the evaluations of the parents.

"Q. So then by the same token any person we bring in also gets the same questions?

"A. I don't follow that.

"Q. Well, his work is not necessarily less reliable because we asked him to do it?

"A. Well, I don't believe that you can automatically exclude expert evaluations and testimony just because of who asked you to do it, but you may ask about the nature of the task, you may inquire about, and surely, as you just have, attempt to impeach the credibility and impartiality of any expert witness on any ground that you consider to be reasonable and to persuade a court of that, and then it becomes a matter of whether there's anything there that you find that lends credence to your concern about impartiality and accuracy."

The court noted that "this deficiency goes to the very issue of safety and well-being of the child." The respondent father did not question Mantell concerning any inconsistencies or changes in findings or conclusions from 1993 through the final report in 1996, which followed the contact with the attorney general and the attempted contact by counsel for the respondent father. Mantell first raised his concern about the lack of personal responsibility for the child's serious injuries in his first report in 1993 and continued to emphasize that concern in subsequent reports and in his trial testimony. An examination of Mantell's final report in February, 1996, together with his earlier reports, reveals a consistency of findings, conclusions, and recommendations throughout. No change in Mantell's position is evident in the final report, the only one prepared after the evaluation report prepared for the department.

It is evident that the trial court did not abuse its discretion in considering and relying on Mantell's testimony because the record is virtually devoid of any indication of bias or other reason to disregard or discount Mantell's testimony. The sole *disqualifying* factor argued by the respondent father is one request from the assistant attorney general, one request from a social worker for the department and the performance of one evaluation of the child.[4]

[4] There are additional factors that weaken the majority's position. One is that the respondent father moved to strike the witness' testimony but, having previously allowed his reports to be admitted as full exhibits without objection, failed to move to strike the reports. Additionally, neither the respondent father nor the majority attempt to distinguish between Mantell's testimony concerning matters occurring within the period prior to any ex parte contact and his testimony and one report after the contact with the department personnel. Further, there is no consideration of the fact that, on the record before us, Mantell was not given any instructions concerning contacts with the parties or the court. In other words, *no evidence was produced* to indicate that ex parte contacts with the parties or the court on this or other matters were prohibited.

It is undisputed that neither the record nor the transcript contains any suggestion of bias on the part of Mantell or of any harm or prejudice to the respondent father occurring as a result of the contact with the attorney general and preparation of the January, 1996 development assessment of the child.[5] The sole basis of the motion to strike was the apparent conflict in being "a neutral person who works for the Court and also a witness who works for the State." Likewise, the sole basis of the majority's opinion is the apparent conflict in roles. This ground can properly be sustained only if applicable law prohibits such conflict or such ex parte contacts and provides for the severe remedy of striking all the witness' testimony in the event of any transgression.

Neither counsel for the respondent father nor the majority have presented any statutory or decisional authority, state or federal, to support the application of an absolute rule of exclusion to be applied to court-ordered witnesses or to support the extension of the Code of Judicial Ethics to such witnesses. The majority cites several federal cases concerning the neutrality of court-appointed experts. It is true that both *United States* v. *Theriault*, 440 F.2d 713, 715 (5th Cir. 1971), and *United States* v. *Pogany*, 465 F.2d 72, 78 (3d Cir. 1972), emphasize the duty of neutrality on the part of experts appointed by the federal courts pursuant to Rule 28 of the Federal Rules of Criminal Procedure. Neither of those cases, however, suggests that the sanction for a compromise of neutrality should be exclusion of the witness's testimony. Furthermore, *United States* v. *Green*, 544 F.2d 138, 146 n.16 (3d Cir. 1976), cert. denied sub nom. *Tefsa* v. *United States*, 430 U.S. 910, 97 S. Ct. 1185, 51 L. Ed. 2d 588 (1977), also cited by the majority, supports the trial court's ruling in this case. The *Green* court stated: "We note that every ex

---

[5] Additionally, the respondent father fails to point to any harm or prejudice in his brief.

parte communication to the trial court does not require reversal, especially when there has been a subsequent opportunity to cross-examine the declarant concerning such communication and a failure to object at trial to the procedure used." Id. In *Green*, the court held that it was not reversible error for the trial judge to conduct ex parte telephone conversations with the court-appointed witness. As in the present case, the ex parte contact was not "clandestine . . . and full opportunity existed for cross-examination." Id., 146.

Although the majority does not ground its opinion on the Code of Judicial Ethics, consideration of the code is relevant because the remedy prescribed by the majority resembles remedies for violation of the code. In Connecticut, canon 3 of the Code of Judicial Ethics prohibits judges from ex parte contacts[6] and canon 2[7] requires judges to avoid impropriety and the appearance of impropriety. We have determined that the standard embodied in the code applies to attorney trial referees. *DeSalle* v. *Appelberg*, 44 Conn. App. 323, 688

---

[6] Canon 3 (a) (4) of the Code of Judicial Conduct provides in relevant part: "A judge should accord to every person who is legally interested in a proceeding, or that person's lawyer, full right to be heard according to law. A judge shall not initiate, permit or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding except that:

"(A) Where circumstances require, ex parte communications for scheduling, administrative purposes or emergencies that do not deal with substantive matters or issues on the merits are authorized; provided:

"(i) the judge reasonably believes that no party will gain a procedural or tactical advantage as a result of the ex parte communication, and

"(ii) the judge makes provision promptly to notify all other parties of the substance of the ex parte communication and allows an opportunity to respond. . . ."

The official commentary to canon 3 a (4) provides that a "judge must not independently investigate facts in a case and must consider only the evidence presented. . . ."

[7] Canon 2 (a) of the Code of Judicial Conduct provides: "A judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

A.2d 1356 (1997). We have not, however, extended coverage of the judicial canons to those not acting in an adjudicatory capacity. After a review of the comments to the canons, and treatises on judicial misconduct, I think that it would not serve the purpose of the canons to extend their proscriptions to court-appointed witnesses. The remedy for violation of the code in such cases does not depend on proof of actual bias and does not require a showing of harm or prejudice. The standard is whether the misconduct causes an outside observer to question the judge's impartiality. Id., 328–29.

While there is good reason to apply the code to attorney trial referees, who perform quasi-judicial duties, no authority has been cited or located—within or outside Connecticut—that applies such a rule to court-appointed witnesses. Common sense supports the difference in treatment of judicial officials and witnesses. Unlike judicial officials, witnesses can be cross-examined and impeached before the judicial officials who are performing the fact-finding function. The trial court correctly held, in essence, that Mantell's conduct was the appropriate subject of impeachment. In that regard, I have noted that there is no evidence of the circumstances or content of the communications with the department personnel. Nor is there any indication of whether the special assignment to evaluate the child had any bearing on Mantell's findings or opinions. Nor is it clear what the circumstances were in the contact made by counsel for the respondent father with Mantell. The fact that Mantell did not remember what the respondent's counsel said is not conclusive of the matter. A comparison of Mantell's four reports fulfilling his duties as court-appointed evaluator, and even his report prepared at the department's request, which was marked for identification only, reveal no inconsistency or change in his findings or opinions. The final report,

prepared after the contact with the department, is consistent with the earlier reports. Moreover, Mantell's oral testimony was consistent with his reports from 1993 through 1996.

I find no authority or reason to justify the application of an absolute rule of exclusion to a court-appointed witness in these circumstances. The record fails to show any reason for striking Mantell's testimony. Counsel for the respondents, had the opportunity to cross-examine and impeach the witness. The respondents failed to establish why the testimony of this witness, who performed evaluations and prepared reports for nearly two years before the first ex parte contact, should be stricken. Because I agree with the majority's disposition of the first claim, I would affirm the judgment of the trial court rather than remanding it for a new trial at which, apparently, the parties and the trial court will function without the benefit of the testimony of the mental health professional who followed, evaluated and reported on this child, his parents and the foster family consistently since 1993. The severe remedy of exclusion of the expert's testimony applied in a situation in which the expert operated without instructions from the court, was contacted by both parties to the appeal and was subject to cross-examination, produces, in my view, an unwise and unfair result.

For the foregoing reasons, I respectfully dissent.