### IN RE DAVID W.*
### (SC 16113)

Norcott, Katz, Palmer, Vertefeuille and Ronan, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued May 30—officially released October 10, 2000

*Benjamin Zivyon*, assistant attorney general, with whom were *Susan T. Pearlman* and *Bette L. Paul*, assistant attorneys general, and, on the brief, *Richard Blumenthal*, attorney general, for the appellant (petitioner).

*Bradford J. Chaucer*, for the appellee (respondent mother).

*William R. Kinloch*, for the appellee (respondent father).

*Mary S. Chromik*, for the minor child.

*Keely Magyar* and *Martha Stone* filed a brief for the Center for Children's Advocacy, Inc., as amicus curiae.

*Opinion*

NORCOTT, J. The dispositive issue in this certified appeal is whether ex parte contact between a court-appointed expert witness and the party on whose behalf

that witness testifies requires the per se exclusion of the expert witness' testimony. We conclude that it does not and, accordingly, we reverse the judgment of the Appellate Court.

The petitioner, the commissioner of the department of children and families (department), appeals from the decision of the Appellate Court, reversing the judgment of the trial court. The respondents, the mother and father of David W., claim that the trial court improperly denied the respondent father's motion to strike the testimony of David Mantell, a clinical psychologist, who had been appointed by the court to evaluate the rehabilitation progress of the parents, but who also had ex parte contacts with the department and testified as an expert for the department. The trial court, *Foley, J.*, determined that the appropriate remedy for a party who claims that an ex parte communication has compromised a court-appointed witness' neutrality is to impeach the witness in order to affect the weight given to the witness' testimony. Accordingly, the trial court declined to strike Mantell's testimony. The Appellate Court reversed the trial court, holding that "the court should have granted the motion to strike the testimony of its appointed expert because of the conflict created by his agreement to testify on behalf of the department and also because of the ex parte contacts with counsel for the department." *In re David W.*, 52 Conn. App. 576, 590, 727 A.2d 264 (1999). We granted the department's petition for certification to appeal limited to the following issues: (1) "Under the circumstances of this case, was the trial court required as a matter of law to strike all of the testimony of David Mantell, the court-appointed expert witness?"; and (2) "If the answer to question one is yes, was the error harmful?" *In re David W.*, 249 Conn. 907, 733 A.2d 225 (1999).

The following facts are properly set forth by the Appellate Court. "The child was born to the respondents

on July 12, 1993. He was born three months premature, weighing only three pounds nine ounces and remained in the hospital for eighteen days. He was discharged on August 1, 1993, and lived with his parents until September 5, 1993. On that date, he was brought to the hospital after having sustained multiple life threatening injuries: four fractures of the left ribs; a fracture showing interval healing of the right femur; a spiral fracture of the left femur; a distal fracture of the left femur, which appeared to have healed; two recent fractures of the right tibia and fibula; a collapsed lung and multiple bruises and petechiae on the face, neck and chest, probably caused by the child screaming in pain according to the testimony of a physician. The parents had exclusive control and custody of the child immediately preceding his injuries. They offered no reasonable explanation for the injuries sustained by their child.

"On September 8, 1993, the child was discharged from the hospital and placed in the care of the department, which obtained an order of temporary custody on the same date. After a study by the department foster care unit, he was placed with a couple known to the respondents. The child has resided with the couple since December 24, 1993, but the respondents have visited him, as permitted by the department, since that time, either at their home or at the home of the foster parents. On January 11, 1994, the respondents pleaded nolo contendere to the neglect petition that the department had filed. The court, *Barnett, J.*, adjudicated the child to be a neglected child pursuant to General Statutes (Rev. to 1993) § 46b-129 (d)[1] [now codified at § 46b-129 (j)]

---

[1] General Statutes (Rev. to 1993) § 46b-129 (d), as amended by Public Acts 1993, No. 93-91, provides in relevant part: "Upon finding and adjudging that any child or youth is uncared-for, neglected or dependent, the court may commit him to the commissioner of children and families for a maximum period of eighteen months, unless such period is extended in accordance with the provisions of subsection (e) of this section, provided such commitment or any extension thereof may be revoked or parental rights terminated at any time by the court, or the court may vest such child's or youth's care and personal custody in any private or public agency which is permitted

and committed him to the department in accordance with that statute." *In re David W.*, supra, 52 Conn. App. 580. After the child was committed, the department initiated proceedings to terminate permanently the parental rights of both respondents.

The following additional facts are pertinent to the resolution of this appeal. Sometime before November, 1993, the trial court appointed Mantell to evaluate the suitability of the respondents as parents in the event that their child was returned to them. The appointment was made pursuant to an agreement of both parties.

Mantell testified that he was asked " 'to see a group of four adults and one child, perform psychological assessments and offer an opinion about the psychological character restrictions of the people involved in connection with an infant that had been seriously injured multiple times in order to assist the [department] and the court with the major child protection issue, which was where would it be safe for this child to live and did any of the four adults possess characteristics that potentially endangered the child.' " Id., 592 (*Schaller, J.,* dissenting). Mantell initially received a " 'package of materials from the court, and it consisted of the evaluation order, a motion for evaluation by agreement of the parties, the petition, the summary of facts and the social study.' " Id. When asked at trial, "[w]ho contacts you [when acting as a court-appointed evaluator]?" Mantell replied: " 'Well, usually it's the court service officer. Sometimes it's the social worker. On rare occasions, it's the attorney. On rare occasions, it's the attorney general. But whoever does it, it's the person that's agreed upon is going to do the job of contacting the evaluator who's to do the court-ordered study and

by law to care for neglected, uncared-for or dependent children or youth or with any person found to be suitable and worthy of such responsibility by the court. . . ."

to inform that person that that person has been asked to do this.' " Id. The record does not indicate whether any specific instructions were given to Mantell or who in fact initiated the contact in this case.

Mantell was asked by the court to prepare reports on four occasions. The reports were dated November 27, 1993, March 7, 1994, July 17, 1995, and February 26, 1996. Id. The first three reports preceded the ex parte contact. All four reports were introduced into evidence without objection and neither respondent made a motion to strike the reports. Id.

In September, 1995, Bette Paul, the assistant attorney general assigned to this case, contacted Mantell and asked to meet with him.[2] Id., 593. Mantell testified that he was contacted by Paul and asked to complete a developmental assessment of the child, not of the parents. Mantell stated that " '[i]t was [Paul] who called and asked me to do the home study. It was the [department's] social worker who called and asked me to do the follow-up developmentals and collateral contacts.' " Id. There was no evidence offered at trial indicating that the social worker or Paul made any additional requests beyond the home study and developmental contacts. Mantell testified that with respect to the January, 1996 evaluation he conducted, he knew that he was not acting as a court-ordered evaluator. Id. Upon the department's request for an evaluation, Mantell prepared a report of the developmental assessment of the child dated January 23, 1996. This report was marked as an exhibit solely for identification purposes and not introduced as evidence. Id.

At the termination hearing, Mantell testified on direct examination that the option of returning the child to

[2] The record indicates that the department also had contact with Mantell in January, 1996. Having completed the three reports he had been asked to prepare at that point, Mantell was not conducting a court-ordered evaluation at either time.

the parents' custody and care was "intolerably risky." He explained that the need to identify who injured the child and a meaningful parental acknowledgment of responsibility for those injuries were priorities for safe reunification. Mantell's testimony mirrored the conclusions of the four reports he had prepared over the course of three years. These reports consistently reflected his concerns regarding the manner in which the multiple serious injuries were inflicted on the child and the crucial need to identify the perpetrators of the child's injuries. The reports also expressed concern that the parents' inability to acknowledge responsibility for the injuries presented ongoing risks for the child. Id., 594–95.

The ex parte contact regarding the developmental assessment was raised during Mantell's direct examination. No motion to strike Mantell's testimony was made by either of the respondents' counsel at that time. Id., 593. During cross-examination, however, the respondent father's counsel questioned Mantell regarding his contact with the department and subsequently moved to strike Mantell's testimony because " 'he cannot simultaneously be a neutral person who works for the court and also a witness who works for the state.' " Id., 593–94. The trial court denied the motion to strike, ruling that such conflicts " '[go] to the weight of his testimony.' " Id., 594. The respondent father's counsel subsequently continued his cross-examination, attempting to impeach Mantell by specifically questioning him regarding the dual roles he allegedly undertook.

Additionally, based on the record before this court, it appears Mantell was not given unequivocal instructions concerning contacts with the parties or the court. No evidence was produced in this case indicating that ex parte communications with the court or the parties were prohibited. Id., 595 n.4. In fact, it appears that *both*

parties were unclear as to whether it was permissible to communicate with Mantell. Mantell testified that at some unidentified time, he received a request from the respondent father's counsel for information concerning the case. Id., 593. Mantell indicated this communication occurred while both were working on a different case. Furthermore, the developmental assessment Mantell conducted at the request of the department concerned only the child, *not* the parents, and was *not* offered into evidence, but merely was marked for identification. Id. It appears that Mantell may have been told not to talk to the respondents' counsel without direction or consent from Paul. When asked whether he told the respondent father's counsel that he would not speak to him until he received consent from Paul, Mantell replied he did not recall, but stated, " 'It's something that I could have said.' " Id. Specifically, the department should have disclosed to the court and the respondents the nature and extent of its ex parte communications prior to the trial.

Based on the evidence presented, the trial court terminated both the respondent mother's and the respondent father's parental rights to the child. Specifically, the court relied on the following two grounds set forth in General Statutes (Rev. to 1995) § 17a-112 (b) for terminating the parental rights: "(2) the parent of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child; [and] (3) the child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being. Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence

of acts of parental commission or omission sufficient for the termination of parental rights . . . ."

The trial court concluded that the respondents' inability to acknowledge and accept responsibility for the injuries, despite years of therapy, was a deficiency that "goes to the very issue of safety and well-being of the child. This is not an issue that can be carefully skirted in therapy." The court accepted and adopted Mantell's observations concerning the failure of the respondents to acknowledge or accept responsibility for their actions in seriously injuring their own child. The court also ruled that the acts of parental omission and commission were the "most applicable" ground for termination.[3]

On appeal to the Appellate Court, the respondent father claimed that the trial court should have stricken Mantell's testimony because Mantell had had ex parte contacts with counsel for the department and testified as its expert witness concerning the rehabilitation of the parents. The Appellate Court concluded that the trial court "should have granted the motion to strike the testimony of its appointed expert because of the conflict created by his agreement to testify on behalf of the department and also because of the ex parte contacts with counsel for the department." *In re David W.*, supra, 52 Conn. App. 590. The Appellate Court applied a rule of per se exclusion to Mantell's testimony

___

[3] The trial court explained: "Here the child has been clearly exposed to nonaccidental or inadequately explained serious physical injury. The father has obliquely suggested that he possibly did something harmful. The mother has, at a minimum, failed to protect the child. After nearly four years, the parents are only marginally able to deal with their responsibility for, if not participation in those injuries. The court finds that this ground has been proven by clear and convincing evidence."

because of the apparent compromise of neutrality. Id. The case was remanded to the trial court for a new trial.[4]

On appeal to this court, the department claims that the trial court was not required as a matter of law to strike all of Mantell's testimony. Specifically, the department asserts that there was no impropriety or evidence of bias inherent to Mantell's testimony or to his relationship with both the court and the parties involved. Additionally, the department claims that the Appellate Court improperly adopted an absolute exclusionary rule for court-appointed experts who engage in ex parte contacts. The department argues that the proper remedy[5] for this type of situation is to allow the respondents to impeach the credibility of the expert through cross-examination and by calling their own witnesses. Conversely, both respondents argue that because court-appointed psychologists hold a unique place in cases concerning the termination of parental rights and are often relied on by judges in their determinations, any deviation from the court-appointed expert's role as a neutral expert requires exclusion of the testimony. We agree with the department that the trial court properly held that, rather than a per se exclusion, the remedy for a party who claims that an ex parte communication has compromised a court-appointed witness' neutrality is to impeach the witness in order to affect the weight and credibility of the witness' testi-

---

[1] The attorney for the respondent mother did not join in the motion to strike the testimony on appeal to the Appellate Court. The Appellate Court's order for a new trial, however, applied to both the respondent father and the respondent mother because both were affected adversely by the trial court's ruling. *In re David W.*, supra, 52 Conn. App. 588 n.5. On appeal to this court, both respondents filed separate briefs, each arguing that the Appellate Court's holding was proper.

[5] The department did acknowledge at oral argument before this court that it should have received approval from the trial court prior to initiating ex parte contact with Mantell.

mony. Accordingly, we reverse the judgment of the Appellate Court.[6]

As a threshold matter, we note that the Appellate Court's conclusion regarding ex parte contacts with a court-appointed witness is a question of law and, therefore, our review is plenary. "[W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct . . . ." *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221, 435 A.2d 24 (1980). Thus, where the "issues present questions of law, [they are] subject to our plenary review." *Commission on Human Rights & Opportunities* v. *Sullivan Associates*, 250 Conn. 763, 786, 739 A.2d 238 (1999).

The dispositive question that we must decide is whether improper ex parte contact between a court-appointed expert witness and the party on whose behalf that witness testifies requires a per se exclusion of the expert's testimony. The Appellate Court's per se exclusion rests on the apparent conflict between Mantell's role as a court-appointed expert and his ex parte contacts with the department. No state or federal statutes or case law, however, support the application of a *per se exclusion* for court-ordered witnesses who make ex parte communications with one of the parties. Contrary to the respondents' contention, there is no precedent that suggests that because court-appointed experts are supposed to remain unbiased and impartial, they are not allowed to testify as witnesses for a party or have ex parte contacts with that party.

We do not condone the ex parte communications that occurred in this case. The ex parte communications in this case were improper. We agree with the department's acknowledgment at oral argument before this

---

[6] Since we answer the first certified question in the negative, we need not address the second certified question.

court that it should have received approval from the trial court prior to initiating an ex parte contact with Mantell. We are confident that this situation will not arise in the future, especially in light of the fact that the judicial branch recently issued guidelines concerning ex parte contacts between court-appointed experts and the parties and their respective counsel.[7] We conclude, however, that because the trial judge is in the best position to neutralize whatever prejudice or misconduct may arise in these situations, a per se exclusion is not required.

Previously, we held that "[t]he credibility of expert witnesses and the weight to be accorded their testimony are within the province of the trier of facts, who is privileged to adopt whatever testimony he reasonably believes to be credible." (Internal quotation marks omitted.) *Transportation Plaza Associates* v. *Powers*, 203 Conn. 364, 378, 525 A.2d 68 (1987). Furthermore, it is well settled that the trial court possesses discretion in ruling, not only on the qualifications of expert witnesses, but on the admissibility and weight of their opinions and testimony. *State* v. *Kemp*, 199 Conn. 473, 476, 507 A.2d 1387 (1986). "As the witness qualified as an expert, *any objection to his testimony would go to its weight rather than to its admissibility*." (Emphasis added; internal quotation marks omitted.) *State* v. *Avila*, 166 Conn. 569, 576, 353 A.2d 776 (1974). "It is rare for

[7] The chief administrative judge for juvenile matters, Judge Christine Keller, in a memorandum to all Superior Court judges and judge referees for juvenile matters dated May 10, 1999, set forth new guidelines to be followed regarding contacts between counsel and court-appointed evaluators. The new procedures provide that all court-ordered evaluations, regardless of the status of the case in court, will be scheduled by court services officers. Further, any and all communications, written, oral or otherwise, with the court-appointed evaluators must be between the court services officer and the evaluator only, until the evaluation is filed with the court. Also, no information is to be provided to any court-appointed evaluator unless the parties have sought and received the court's permission.

this court to find that a trial court has erred in a ruling permitting expert testimony." *State* v. *John*, 210 Conn. 652, 677, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989). While we emphasize that court-appointed witnesses should remain neutral and impartial in conducting their evaluations, we conclude that the remedy of impeaching the expert through cross-examination and calling other witnesses in order to challenge the weight and credibility of the expert's testimony is a sufficient remedy when that neutrality is breached.

Previously, we have held that even when the state violates a sequestration order by allowing its expert witnesses, prior to their testimony, to review a transcript of the defendant's expert's testimony, "[t]he remedy for such a violation rests in the trial court's discretion, guided by a primary concern for the fairness of the trial, not the culpability of the prosecution." (Internal quotation marks omitted.) *State* v. *Falby*, 187 Conn. 6, 27, 444 A.2d 213 (1982); see *Smith* v. *Phillips*, 455 U.S. 209, 219, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982); *State* v. *Cosgrove*, 186 Conn. 476, 488–89, 442 A.2d 1320 (1982). In denying the defendant's proposed remedy of disqualification of the expert witness, this court in *Falby* held that the trial court's remedial measures of allowing cross-examination of the state's expert, informing the jury that it should weigh and consider that the defense experts did not have access to the state expert's testimony, and preventing any other state experts from having access to the defense expert's transcript were sufficient to neutralize any prejudice or harm. *State* v. *Falby*, supra, 26–27.

Recently, we addressed the issue of the trial court's discretion with regard to conducting an initial inquiry. "[W]e cannot say that the trial court abused its discretion in not conducting, sua sponte, an evidentiary hearing for the purpose of inquiring further into the facts

and circumstances that gave rise to the prosecutor's allegations. The trial court was entitled to credit the truth of defense counsel's assertions . . . and, therefore, to rely on them in support of its finding that the sequestration order had been violated. . . . Accordingly, to require an evidentiary showing to support representations of counsel concerning such matters would impugn the veracity of counsel and impose a staggering burden of time and effort on our already overburdened court system. . . . Indeed, given defense counsel's explanation of events, it is highly doubtful that an evidentiary hearing on the factual underpinnings of the prosecutor's allegations would have been of any value whatsoever." (Citations omitted; internal quotation marks omitted.) *State* v. *Nguyen*, 253 Conn. 639, 657–58, 756 A.2d 833 (2000).

The trial court's remedy in the present case was equally sufficient. The trial court allowed cross-examination of Mantell, permitted both respondents throughout the trial to call their own expert witnesses, and, properly acting as the trier of fact, acknowledged on the record that evidence of the ex parte contact would go toward the weight of the testimony. These remedial measures, coupled with the fact that Mantell's testimony was consistent with his findings, conclusions, and recommendations made prior to the ex parte contact, make absolute exclusion of his testimony an unnecessarily draconian remedy. We emphasize, however, that the trial court's choice of cross-examination as the proper remedy in this case is but one factor that a trial court may consider within the bounds of its sound discretion.

The limited case law in other jurisdictions regarding ex parte communications with court-appointed experts supports our own state precedents and our conclusion in the present case. For example, in *United States* v. *Green*, 544 F.2d 138, 146 (3d Cir. 1976), the Third Circuit

Court of Appeals held that no reversible error occurred despite the fact that the trial judge engaged in an ex parte communication with the court-appointed examiner and refused to appoint a new evaluator. The Court of Appeals noted that "every ex parte communication to the trial court does not require reversal, especially when there has been a subsequent opportunity to cross-examine the declarant concerning such communication . . . ." Id., 146 n.16. The Court of Appeals noted that because disclosure of the judge's communications with the expert occurred in open court, ample opportunity existed for the defendants to cross-examine the court-appointed examiner and call its own experts. Thus, the court concluded that impeachment through cross-examination, not absolute exclusion, was the appropriate remedy. Id., 146.

Similarly, with regard to the respondents' claim in the present case that court-appointed experts are not allowed to testify on behalf of one of the parties, the remedy of impeachment of the expert is sufficient. In *United States* v. *Theriault*, 440 F.2d 713, 714 (5th Cir. 1971), the issue was whether the court-appointed evaluator's position as a prison psychiatrist and, therefore, a government employee of the department, compromised his neutrality, thereby adversely impacting the defendant's interest in having a neutral evaluator. The Fifth Circuit Court of Appeals held that although a court-appointed evaluator should remain neutral and impartial throughout the proceedings, an "objection to the prison psychiatrist based on alleged adverse interest is not tenable. The doctor was subject to cross-examination on possible interest and bias, but he was not incompetent to testify." Id., 715. Furthermore, rule 706 (a) of the Federal Rules of Evidence provides that a court-appointed expert witness "may be called to testify by the court or any party. The witness shall be subject

to cross-examination by each party, including a party calling the witness."

In the present case, excluding Mantell's testimony because he testified on behalf of the department would be an improper remedy. There is no evidence of bias or prejudice by Mantell to discount his testimony. Additionally, Mantell's fourth report in February, 1996, made after the ex parte contact, is consistent with his earlier reports from the preceding three years.[8] Mantell initially raised his concerns regarding the lack of acknowledgment of responsibility for the child's serious injuries in his first report in 1993, and continued to emphasize these concerns in subsequent reports, articulating them during his testimony. Examining all four of the reports in conjunction with his testimony reveals *complete consistency among his* findings, recommendations, and conclusions. In fact, Mantell's fourth report, issued after the ex parte contact, is the most positive of the four reports, although acknowledgment of personal responsibility by the parents still had not occurred. The reports, themselves, indicate that Mantell remained impartial.

Additionally, the respondents' counsel had ample opportunity to impeach Mantell in order to affect the weight of his testimony. In fact, the respondent father's counsel did attempt to impeach Mantell.[9] Both the

---

[8] Judge Schaller's dissenting opinion in the Appellate Court notes that the majority's position was weakened by the fact that the respondent father failed to move to strike the reports Mantell made, moving to strike only his testimony. Mantell's testimony mirrored his written reports. *In re David W.*, supra, 52 Conn. App. 595 (*Schaller, J.*, dissenting).

[9] After the trial court overruled the respondent father's counsel's motion to strike, counsel did in fact engage in cross-examination in an attempt to impeach Mantell.

"[Respondent Father's Counsel]: So when you were talking before that unlike the hired gun we're going to be bringing in, you can be trusted because you work for the court, that's only true in part of the case?

"[Mantell]: I don't think I used that language.

"Q: No, you didn't. I'm sorry.

"A: I don't think I made any reference to a hired gun who was more trust-

Appellate Court and the respondents conclude that a violation occurred because Mantell agreed to testify on behalf of the department. Both parties, however, had listed Mantell as an expert witness and, therefore, had notice that Mantell was to testify at trial. Moreover, the respondent mother's counsel indicated in his disclosure of expert witnesses to the court that he intended to call Mantell if the department chose not to, and to ask him about his continual visits with the parents over three years. Thus, a per se exclusion preventing any party from allowing a court-appointed expert to testify on behalf of that party would effectively mean that only the court, and not the parties, could call a court-appointed expert to testify. Our rules of practice, however, do not provide any procedures for the court to call witnesses.

We conclude that the Appellate Court improperly held that the trial court was required as a matter of law

worthy.

"Q: I think that you called somebody working for the court more trustworthy than someone hired by the parties because there is no specific ax to grind.

"A: No, I said that's an issue that should or could be considered.

"Q: So then the court can also consider that you work part-time for the state's attorney in this case?

"A: I think that the court can ask itself is there any reason to have less faith in the later work that I did when the attorney general's office asked me to follow up on the child than it does in the other work that I was asked to do that preceded those requests that had to do with the evaluations of the parents.

"Q: So then by the same token any person we bring in also gets the same questions?

"A: I don't follow that.

"Q: Well, his work is not necessarily less reliable because we asked him to do it?

"A: Well, I don't believe that you can automatically exclude expert evaluations and testimony just because of who asked you to do it, but you may ask about the nature of the task, you may inquire about, and surely, as you just have, attempt to impeach the credibility and impartiality of any expert witness on any ground that you consider to be reasonable and to persuade a court of that, and then it becomes a matter of whether there's anything there that you find that lends credence to your concern about impartiality and accuracy."

to strike Mantell's testimony. Having established that no per se exclusion was required, it is not necessary to remand this case to the trial court. It is well settled that a trial court's evidentiary rulings "will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice . . . ." (Internal quotation marks omitted.) *State* v. *Hoffler*, 55 Conn. App. 210, 215, 738 A.2d 1145, cert. denied, 251 Conn. 923, 742 A.2d 360 (1999). The trial court did not abuse its discretion in allowing Mantell's testimony, despite the ex parte communications, because neither the transcript nor the record reveal any indication of bias by Mantell or any harm or prejudice to the respondents. Although the respondents correctly note that courts often do rely heavily on court-appointed experts in parental termination proceedings, the trier is entitled to accept in part, disregard in part, or even reject in whole, the uncontradicted testimony of a witness. *Smith* v. *Smith*, 183 Conn. 121, 123, 438 A.2d 842 (1981); *In re Cesar G.*, 56 Conn. App. 289, 297, 742 A.2d 428 (2000); *In re Tricia A.*, 55 Conn. App. 111, 114–15, 737 A.2d 974 (1999); see *Anonymous* v. *Norton*, 168 Conn. 421, 428–31, 362 A.2d 532, cert. denied, 423 U.S. 935, 96 S. Ct. 294, 46 L. Ed. 2d 268 (1975). We emphasize that the determination of the proper remedy for such a conflict is within the sound discretion of the trial court. Thus, exclusion may be appropriate in some instances and not in others, depending upon the facts presented. As we have explained, the trial court in the present case did not abuse its discretion by refusing to strike the expert's testimony. That is not to say, however, that that is necessarily always the proper remedy to be adopted.

We conclude that ex parte contact between a court-appointed expert witness and a party or its counsel on whose behalf that witness testifies, does not require the exclusion of the expert witness' testimony as a

matter of law. When the neutrality of a court-appointed expert is questioned in parental termination proceedings, the trial court should allow the opposing party to explore the extent of any contacts, bias or prejudice through cross-examination of the expert. Further, the opposing party should be given the opportunity to have its own witnesses testify on its behalf. These steps eliminate the need for an absolute bar of the testimony.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgment of the trial court.

In this opinion the other justices concurred.