# IN RE JORDEN R.*
## (AC 28128)

DiPentima, Harper and Stoughton, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued November 28, 2007—officially released April 15, 2008

*Michael J. Melly,* for the appellant (respondent mother).

*Christopher L. Aker,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, and *Susan T. Pearlman,* assistant attorney general, for the appellee (petitioner).

*Karen Oliver Damboise,* for the minor child.

STOUGHTON, J. The trial court rendered judgment granting the petition by the petitioner, the commissioner of children and families, to terminate the parental rights of the parents of the minor child, Jorden R. The respondent mother appeals from the judgment.[1] She claims that (1) the decision to terminate her parental rights was against the weight of the evidence and clearly erroneous, (2) the court improperly refused to allow expert testimony and (3) the court improperly refused to transfer guardianship to the maternal grandparents.[2] We agree in part with the first and second claims, and, therefore, we reverse in part the judgment of the trial court.

On July 27, 2005, the petitioner was granted an ex parte order of temporary custody. On the same date, a neglect petition was filed. On October 27, 2005, a petition to terminate parental rights pursuant to General Statutes § 17a-112 (j) (3) (C) was filed.[3] The petitions were consolidated and tried together.

[1] The child's father consented to the termination of his parental rights during the course of the trial, and he is not involved in this appeal. Therefore, we refer to the mother as the respondent.

[2] The respondent has not adequately briefed her third claim. Therefore, we decline to afford it review.

[3] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court . . . may grant a petition [for termination of parental rights] if it finds by clear and convincing evidence that: (1) the Department of Children and Families has made reasonable efforts . . . to reunify the child with the parent . . . unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts . . . (2) termination is in the best interest of the child, and (3) . . . (C) the child has been denied, by reason of an act or acts of parental commission or omission including, but not limited to . . . severe physical abuse or a pattern of abuse, the care, guidance or control necessary for the child's physical, educational, moral or emotional well-being, except that nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights . . . ."

The following facts and procedural history are relevant to our resolution of the issues raised by the respondent's appeal. Jorden was born on June 19, 2005. The respondent was born on December 15, 1988, and was sixteen years old when her son was born. The father was born on May 2, 1985, and was twenty years old when the child was born. The respondent, who was then in high school and living with her parents, began dating the father during the summer of 2004. He had dropped out of high school and was living in his own apartment. He became very angry when he learned that the respondent was pregnant, and their relationship ended for a time. They resumed their relationship in January, 2005, and the respondent then began spending the weekends at the father's apartment with the consent of her parents.

The relationship between the two was a stormy one during this period, and they had frequent arguments. The respondent believed that the father was using drugs and seeing other women. In May, 2005, the father lost his apartment and moved in with the respondent and her parents. On June 19, 2005, Jorden was born. On July 23, 2005, the father and the respondent planned to leave the baby with the respondent's mother and to visit friends. They planned to return to pick up the baby and to spend the night at the home of the father's grandmother in order to do some work around the house the following morning before the grandmother returned from a trip. They arrived at their friends' house between 5:30 and 6 p.m. The respondent testified that while there, she drank an alcoholic, fruity beverage and had one "hit" from a marijuana pipe and that the father had been drinking alcohol and smoking marijuana. When they went back to pick up the baby, the father testified, the respondent was asleep in the car. At the grandmother's house, the respondent fixed the baby's formula and took it to the room where they were to

stay. The respondent testified that she awoke at 2 a.m. on July 24, 2005, and fed Jorden and put him back to bed. She testified that she was awakened by the father between 9:30 and 10 a.m. and fed Jorden. The father testified that he also awoke with Jorden and that he then slept until 8:30 or 9 a.m. He gave differing accounts, however, of when he awoke with the baby, and, in addition, the police discovered that he had been at a convenience store with a friend from 7:15 a.m. to 8 a.m. on July 24, 2005.

When the respondent fed Jorden at about 10 a.m., she saw that his hand began to twitch at ten to fifteen second intervals. She called her mother for advice, and her mother suggested that she change Jorden's position. Jorden slept until about 1 p.m., and when he awoke, the respondent fed him and put him back to sleep. She had noticed the twitching again and called her mother after Jorden went back to sleep. They agreed to meet for dinner, at which time they would evaluate the child. The father and the respondent drove to the house of the respondent's parents with Jorden, arriving at about 7 p.m. Jorden was twitching, so they called a pediatrician but could reach only the answering service. The respondent's mother picked the baby up and noticed swelling in the region of the right temple. She told the parents to take Jorden to the emergency room at Windham Hospital.

At the hospital, the emergency room nurse called for a physician because the baby was having a seizure. Jorden was having clonic tonic seizures, and facial twitching and right eye deviation were noticed. There was a soft area in his scalp, consistent with bruising or swelling, and anterior chest trauma. A computerized tomography scan revealed a skull fracture, and an X ray showed a fracture of the clavicle. A physician opined that Jorden had symptoms consistent with shaken baby syndrome. There had been no report of accidental

injury, and the respondent and the grandparents denied any knowledge of an injury. The physician reported that the father appeared aggressive and was not engaging in conversation. Jorden was transported to Hartford Hospital by helicopter and then to the pediatric intensive care unit of Connecticut Children's Medical Center. Among his injuries were a compound skull facture with overlying hematoma, severe brain dysfunction associated with large subdural effusion, and brain swelling and retinal hemorrhages in the left eye. The collection of fluids in Jorden's brain were of different ages, possibly indicating two episodes of trauma. With the consent of the parents, an order not to resuscitate was placed on Jorden's hospital chart. Eventually, the child was discharged in guarded condition and placed in a foster home specializing in care for children with complex medical conditions.

Our standard of review on an appeal from a termination of parental rights is whether the challenged findings are clearly erroneous. Our function is to determine whether the court's conclusion was legally correct and factually supported. We do not examine the record to determine whether a different conclusion might have been reached. Every reasonable presumption is made in favor of the trial court's ruling. See *In re Vincent B.*, 73 Conn. App. 637, 640–41, 809 A.2d 1119 (2002), cert. denied, 262 Conn. 934, 815 A.2d 136 (2003).

I

The respondent claims that the court improperly terminated her parental rights as to the child. Specifically, she argues that it improperly determined that (1) there was clear and convincing evidence that she harmed the child by acts of commission or omission pursuant to § 17a-112 (j) (3) (C), (2) she was unwilling or unable to benefit from reunification services, thus relieving the department of children and families (department) of

the obligation to attempt to reunify her with her child, and (3) termination was in the best interest of the child.[4]

"In order to terminate a parent's parental rights under § 17a-112, the petitioner is required to prove, by clear and convincing evidence, that: (1) the department has made reasonable efforts to reunify the family . . . (2) termination is in the best interest of the child . . . and (3) there exists any one of the seven grounds for termination delineated in § 17a-112 (j) (3)." (Citations omitted; internal quotation marks omitted.) *In re Shaiesha O.*, 93 Conn. App. 42, 46–47, 887 A.2d 415 (2006).

Our Supreme Court has noted that "[t]he rights to conceive and to raise one's children have been deemed essential . . . ." (Internal quotation marks omitted.) *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 284, 455 A.2d 1313 (1983). This court has stated that "[w]hen the [s]tate initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it. If the [s]tate prevails, it will have worked a unique kind of deprivation. . . . A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one." (Internal quotation marks omitted.) *In re Vincent B.*, supra, 73 Conn. App. 641, quoting *Santosky* v. *Kramer*, 455 U.S. 745, 759, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). We review the respondent's claim with these principles in mind.

A

The respondent first argues that the court improperly determined that the petitioner provided clear and convincing evidence that she violated one of the statutory grounds for termination, namely, § 17a-112 (j) (3) (C). We disagree.

---

[4] Because our resolution of the respondent's second argument is dispositive of this claim, we need not reach her third argument, which is that termination of her parental rights was not in the best interest of the child.

Pursuant to § 17a-112 (j) (3) (C), the court found that the child had been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for the child's physical, educational, moral or emotional well-being. It determined that the specific acts were the severe injuries of a nonaccidental nature, not adequately explained, resulting in life threatening injuries and permanent neurological impairment. The respondent claims that this finding was clearly erroneous as to her because there was no evidence that she committed any act that might have caused the terrible injuries to the child or that she failed to do anything that might have prevented those injuries.

The child must have been with one or both of his parents when he was injured, since neither has suggested that the injuries might have occurred when he was with his grandmother, and both parents acknowledged that he was in their care during the night of the injury. Neither parent admitted to any act that might have caused the injuries, and each has suggested that the other might have been responsible. The father had shown some violent tendencies of which the respondent was aware, and, indeed, she was suspicious of some of his actions with the child. The court found by clear and convincing evidence that the child suffered severe physical injuries that the parents could not explain. The evidence was sufficient to support the court's conclusions. See *In re Cheyenne A.*, 59 Conn. App. 151, 159, 756 A.2d 303, cert. denied, 254 Conn. 940, 761 A.2d 759 (2000).

B

The respondent also argues that it was clearly erroneous for the court to conclude that she was unable or unwilling to benefit from reunification services and that, therefore, the department was not required to provide such services or to attempt to reunify the respondent with her child. We agree that it was clearly

erroneous for the court to have determined that the department did not have to provide reasonable efforts to reunify the respondent with her child on the ground that she was unwilling or unable to benefit from such services.[5]

The following facts are relevant to the resolution of the respondent's claim. The court, *Bear, J.*, approved two lists of preliminary specific steps, one issued to the respondent and the other to the father, at the time that it granted the petitioner's motion for an ex parte order for temporary custody. The purpose of the preliminary specific steps, as stated on the forms, was to guide the parents so that they might "safely . . . regain the custody of the . . . child." The list provided to the respondent was extensive. It initially consisted of twenty specific steps, not all of which were later found to be relevant to the respondent's case. Included among the steps were that the respondent needed to keep her whereabouts known to the department; participate in individual and parenting counseling; engage in a psychological evaluation; sign releases allowing the department to monitor the counseling services and psychological evaluation results; comply with a somewhat ambiguous direction to "obtain and/or cooperate with a restraining/protective order and/or other appropriate safety plan as approved by the [the department] to avoid further domestic violence incidents"; and keep the child's medical appointments and visit with the child

---

[5] We note, preliminarily, that the petitioner, in her petition for termination of the respondent's parental rights, alleged that reunification services were inappropriate, and the court found that the department had no obligation to make reasonable efforts to reunify the respondent with her child. We are not, therefore, presented with a case in which the court has found that the parent has failed to achieve sufficient rehabilitation despite the department's reasonable efforts at reunification; see *In re Anthony H.*, 104 Conn. App. 744, 750, 756, 936 A.2d 638 (2007), cert. denied, 285 Conn. 920, 943 A.2d 1100 (2008); but, rather, we are presented with a case in which the court has determined that the department had no obligation to attempt to reunify the respondent with her child.

as permitted by the department. The court noted that it "hereby approves and orders the above steps as preliminary specific steps. This order shall remain in effect until the court orders final specific steps." The respondent agreed to abide by the preliminary specific steps on August 2, 2005. The record does not indicate that final specific steps were ever prepared for the respondent.

The court, *Foley, J.*, found, after the termination of parental rights hearing, that the respondent had "facially" complied with all of the preliminary specific steps. It also found that the father had failed to comply with several of the steps, most importantly, that he did not "wish to participate in services or counseling to address his anger, his drug abuse or his mental health issues." Despite the differing levels of participation in, and compliance with, the preliminary specific steps by the respondent and the father, the petitioner filed a petition to terminate the parental rights of both parents on October 27, 2005. As part of the petition, the petitioner represented that both the respondent and the father were "unwilling to benefit from reunification efforts." The petitioner relied on the severity of the injury and the failure of either parent to provide an adequate explanation of the cause of the injury to justify the department's refusal to provide reasonable efforts to reunify the respondent with her child.[6] Specifically, the petitioner alleged that the respondent "is unwilling or unable to benefit from reunification services in that Jorden . . . suffered serious physical injuries while in her care . . . for which she has no viable explanation." The petitioner did not allege that the respondent caused the child's injuries, but only that collectively, she and

---

[6] The petitioner also alleged that the respondent was intoxicated at the time of the injury. The petitioner apparently abandoned this allegation at trial.

the father would not or could not explain to department workers how the injuries were caused.

The hearing on the petition for termination of the respondent's parental rights, which had been consolidated with the petition for a finding of neglect, commenced on September 11, 2006. The court heard evidence regarding, among other things, the extent of the respondent's compliance with the preliminary specific steps. Ann Negron, a social worker supervisor who had been employed by the department for twelve years at the time of the hearing, testified about the respondent's compliance with the preliminary specific steps. She testified that the respondent had kept her whereabouts known to the department during the relevant times, and this was undisputed at the hearing. Negron testified that the respondent had engaged in individual and parenting counseling. With regard to this step, the court also heard testimony from the respondent's individual counselor, Nancy B. McDowell, a licensed clinical social worker with a master's degree in social work. McDowell had met with the respondent for twenty-one sessions.[7] During that time, McDowell and the respondent created a list of five goals for the respondent to pursue. These goals included mourning Jorden's injury, dealing with her own history of abuse by the father, learning to deal with "complex social systems" such as the department, continuing to develop an independent voice and developing a social network for emotional support. Although McDowell was initially troubled by the respondent's unwillingness to discuss her deep emotional issues, eventually the respondent did open up, and McDowell was generally pleased with the progress

[7] McDowell testified that during her time counseling the respondent, which lasted from November, 2005, until June, 2006, the respondent canceled or rescheduled ten appointments. She further testified, however, that this frequency of cancellation was not uncommon, and that "by canceling and rescheduling [the appointments, the respondent] was indicating her desire to participate."

that the respondent had made by June, 2006. McDowell also commented that she was "struck by [the respondent's] energy to do the things that had been asked of her in terms of working and going to school and visiting Jorden."

The respondent also completed a psychological examination conducted by David M. Mantell, a psychologist who had been appointed by the court to examine both the respondent and the father. She subsequently took part in a second psychological evaluation, conducted by Ronald D. Anderson, a psychologist, though the court refused to consider the results of this evaluation, as discussed in part II.

Negron testified that the respondent secured a protective order against the father in May, 2006, satisfying that specific step. There is no indication in the record that the petitioner had recommended that she seek such an order prior to that date. The respondent also attended all but one of Jorden's medical appointments. Finally, Negron testified that the respondent visited with the child as allowed by the department. Negron testified that the respondent's "visits have gone very well. . . . She always arrived at least fifteen minutes prior to the visit. She always arrived in a good mood and willing to see the baby. She liked to be there when [the] foster mother arrived so that she could hold the child. [The respondent] also engaged with the child during the visits. . . . She talked to her son. She sang to her son. When he would start crying, she'd pick him up, bring him to the window." Negron further testified that she had noticed an improvement in the respondent's interaction with Jorden over the course of the visits. She testified that the respondent was "more engaging; she has also asked a lot more questions regarding . . . his medical care; she also asked in terms of what he's able . . . to do with the physical therapist. . . . [S]he also has brought in her own books

and various educational toys. She taught Jorden how to do patty-cake and he does respond to patty-cake. She just says patty-cake and he starts clapping. She's very engaging during the visits."

The court also heard testimony that the respondent went beyond the requirements of the preliminary specific steps by attending domestic violence counseling, which began August 31, 2006. This counselor, Donna L. Andrini, testified that she is a certified battered women's counselor who also worked as a victim's advocate. Although Andrini provided only general remarks because she had completed only her first counseling session with the respondent at the time of the hearing, she did indicate that she believed the respondent was sincere in her desire to address any domestic abuse issues.

The court also heard testimony, however, that the respondent began dating the father again after Jorden was injured.[8] The court considered evidence that the reinitiated relationship continued while the respondent was participating in counseling and that the respondent hid the relationship from both her mother and her counselor. The respondent admitted that she had been lured by the father's "sweet talk." The renewed relationship lasted until May, 2006. At that time, the respondent was at her parents' house with a friend. The father, who was no longer welcome in the home, arrived unannounced. After a brief argument with the respondent, the father slapped her on the face. The respondent called the

---

[8] The court stated in its decision that the respondent and the father began dating again six weeks after the injury, in September, 2005. It does not cite the source of this date. The respondent testified that they began dating again about four months after the injury. Another witness, Helen C., whose testimony the court specifically credited, testified that they began dating again a few months after the injury. Negron testified that she saw the respondent and the father at one of Jorden's medical appointments in September, 2005, but she specifically stated that they did not interact with each other.

police and subsequently sought a protective order against the father. As noted previously, she began domestic violence counseling in August, 2006. The respondent testified that at the time of the trial, she had not interacted with the father since May, 2006. Further, she had begun to date someone new. In contrast to her surreptitious relationship with the father, the respondent testified that she had discussed this new relationship with her domestic violence counselor.

The termination of parental rights hearing was held between September 11 and 22, 2006. In its memorandum of decision, the court noted that the department "did not make efforts to actively reunify the child with the parents" and upheld the department's decision by concluding that "the parents have been unable or unwilling to benefit from reunification services." The court did not, however, rely on the department's proffered assertion that the injury alone was sufficient to dispense with its statutory obligation to make reasonable efforts to reunify the respondent with her child but instead evaluated her participation and compliance with the services provided pursuant to the preliminary specific steps in making its decision. The court grounded its determination on the respondent's youth and immaturity and her continued relationship with the father. Specifically, the court found that the department "was presented with a young, immature mother. She continues to be a teenager and act like a teenager. She was not old enough to effectively parent before Jorden's injuries, and she remains too young. No amount of services from [the department] can make her mature beyond her years. Whatever gains were made in [the respondent's] counseling were entirely subverted by her own surreptitious involvement with [the father]."

The court emphasized that it was particularly troubled by the fact that the respondent failed to disclose to her counselors her continued relationship with the father. The court noted that it was concerned that the

respondent was at risk of entering another relationship similar to the one with the father, to the detriment of both her and the child. Although not explicitly included in its "reasonable efforts" analysis, the court elsewhere indicated its concern that the respondent would not be able to address the child's complex medical needs adequately.

Pursuant to § 17a-112 (j), to grant a petition for termination of parental rights, the court must find by clear and convincing evidence that the department has made reasonable efforts to reunify the child with the parent unless the court finds that the parent is unable or unwilling to benefit from reunification services. "The requirement of reunification efforts provides . . . substantive protection for any parent who contests a termination action, and places a concomitant burden on the state to take appropriate measures designed to secure reunification of parent and child. . . . This requirement is based on the well settled notion that [t]he right of a parent to raise his or her children [is] recognized as a basic constitutional right." (Citation omitted; internal quotation marks omitted.) *In re Devon B.*, 264 Conn. 572, 584, 825 A.2d 127 (2003).

Cases involving the termination of parental rights are always difficult and require that the court seek a proper balance between the parent's constitutionally protected interest in the care, custody and control of the child and the interest of the state in protecting the child's health and safety. *In re Christina M.*, 90 Conn. App. 565, 566–67, 877 A.2d 941 (2005), aff'd, 280 Conn. 474, 908 A.2d 1073 (2006). An important goal of the child protection statutes is to preserve family integrity by teaching parents the skills they need to nurture and care for their children. Id., 571.

We review this court's analysis and determination in *In re Vincent B.*, supra, 73 Conn. App. 637, for guidance. In that case, the petitioner filed a petition for termination of the father's parental rights on November 2, 2000,

after having previously filed a petition for a finding of neglect. Id., 638–39. The trial court consolidated the two petitions on November 28, 2000. Id., 639. The court determined that the father was unwilling or unable to benefit from reunification services. Id., 640. The petitioner argued that the department had a six year relationship with the family and that on prior occasions the father had rejected all services that the department recommended. Id., 642. The court had also previously terminated the father's parental rights as to two of his other children. Id. On appeal, this court reversed the judgment terminating the father's parental rights, including the determination that the department was not required to provide reasonable efforts to reunify the parent and the child. Specifically, this court noted that in May, 2001, after the petitioner filed the petition to terminate his parental rights, the father had successfully completed a substance abuse program addressing his alcohol addiction. Id. The department's decision to refrain from providing services for the father, however, resulted from its interaction with him before he had completed the program. Id., 643. This court concluded that the father's "history of not availing himself of services as well as the department's filing of the petition to terminate his parental rights did not relieve the department of a continuing duty to make reasonable efforts [to reunify the father with his child]." Id., 644.

The child in this case was only five weeks old when he sustained his injuries. He is neurologically impaired and will require care for the rest of his life. The choice, however, is not as stark as terminating the respondent's parental rights or leaving the child, wholly unassisted, with what could be an unprepared mother. Unless he is institutionalized, the state will have to provide assistance to any parent, foster parent, adoptive parent or guardian who cares for him, including the respondent if custody is eventually returned to her. The respondent's

immaturity is the one circumstance that advancing years will alter. We do not agree that the evidence supports the finding that the respondent was unwilling and unable to benefit from reunification efforts.

The court properly observed that this single mother was immature and lacking in judgment. This circumstance is not as uncommon as one might wish it were in today's society. It may well be the fact that the department might be able to choose more effective parents than those to whom many children have been born. It must nevertheless take into account the rights of the parents as well as the rights of the child. As our Supreme Court has noted, "[a] parent cannot be displaced [simply] because someone else could do a better job of raising the child . . . ." (Internal quotation marks omitted.) *In re Jessica M.*, 217 Conn. 459, 467, 586 A.2d 597 (1991). This child was only five weeks old when he was injured and has not been in his mother's care since. The respondent was offered certain services through the department and did what she was asked to do. Even though for some of the time she disingenuously continued in some sort of relationship with the father, she eventually obtained a protective order against him and has subsequently notified her domestic abuse counselor of her dating activities. The department never attempted reunification services at least in part because it could not be determined how the child had been injured. In the absence of any suggestion that the respondent intentionally caused those injuries, she was entitled to reasonable efforts of the department to aid her.

II

The respondent next claims that the court abused its discretion when it precluded from evidence the testimony and report of her expert concerning his psychological evaluation of her. We agree in part with the respondent.

The following facts are relevant to the respondent's claim. Prior to the termination hearing, the court appointed Mantell to conduct a psychological evaluation of both the respondent and the father. Mantell was instructed to examine the parents individually. Although he examined them at the same time, he conducted the examinations in separate rooms. Mantell drafted a single report, incorporating information on both parents, on March 8, 2006. Mantell's report included background information about the parents, results from the evaluations he conducted of the parents and a concluding section entitled "Termination Questions." The report specifically declined to make a conclusion regarding termination. Because neither parent admitted to engaging in acts that may have led to the child's injuries, Mantell concluded that "[i]t is therefore . . . not possible to offer a professional opinion about when the parents might be in a position to resume a responsible position in the child's life." In a second paragraph, the report also concluded that although "the accumulated data weighs more heavily against the father," because Mantell was not able to "clearly identify" which parent caused the injuries, he could not make a recommendation regarding parental custody of the child. Mantell subsequently testified at the termination hearing, and his report was entered into evidence as a full exhibit.

After her examination with Mantell, the respondent hired Anderson to conduct an additional psychological examination of her. According to Anderson's report, the purpose of the evaluation was to "assess [the respondent's] adjustment and personality functioning, and to identify any factors which might impair her judgment or ability to care for her child." Anderson, a licensed clinical psychologist, had conducted several evaluations for the judicial branch since 1980. Anderson testified that he had met with the respondent on two

separate occasions to evaluate her and that each session lasted approximately three hours. Anderson drafted a report of the findings he made pursuant to these sessions that included a list of four recommendations, and the reasons for those recommendations, regarding the continued relationship between the respondent and her child. The first recommendation was that the department should take steps toward reunifying the respondent with her son; second, that the reunification plan include a condition that the father be precluded from making direct contact with either the child or the respondent; and third, that the respondent should be provided with training to help her learn how to deal with her child's continuing needs and that she be regularly assessed and provided with specific goals to meet.[9] Prior to drafting his report, Anderson was provided with, and reviewed, the report that Mantell had drafted concerning both parents. It is not entirely clear how Anderson received Mantell's report, but the parties appear to agree that the respondent herself provided it to him and that there was no intentional wrongdoing involved with this disclosure. Anderson reviewed the Mantell report, conducted several interviews with the respondent during which he administered several psychological exams, and drafted his report on September 10, 2006.

At trial, the respondent called Anderson as a witness. After eliciting some background information about the witness' credentials and his evaluation of the respondent, the respondent's counsel proffered his report as a full exhibit. Counsel for the petitioner, the father and the child each stated that they had no objection to admitting the report. The court indicated that the exhibit would be marked as respondent's exhibit two.

[9] Anderson's fourth "recommendation" was not really a recommendation but, rather, a proviso indicating that Anderson did not have any department records to review at the time he drafted his report.

A question then arose regarding whether the copy provided was authentic. The copy offered into evidence appears to have been printed from an e-mail attachment that Anderson had sent to the respondent's attorney. The court recessed to allow Anderson to review the exhibit in order to verify that there were no substantive changes from the report he drafted. After Anderson examined the report, he verified that it was authentic and signed it. At that point, counsel for the child and counsel for the father again stated that they had no objection to the report, and the court admitted the report into evidence. The respondent's counsel then proceeded with the direct examination. During the examination, the father's counsel interrupted and objected for the first time to the report on the ground that the report relied, at least in part, on Mantell's report. Counsel asserted that his client had taken part in Mantell's examination with the belief that its results would stay confidential but that it was clear that Anderson had reviewed the report and, specifically, read Mantell's remarks concerning the father. Further, counsel stated that the information in the Mantell report likely influenced all of Anderson's conclusions. The petitioner agreed.

The court allowed the parties to voir dire the witness to determine the extent to which he relied on the Mantell report. Anderson then testified about the procedures he used in administering the evaluation and gathering data related to the respondent. Anderson testified that he "could certainly describe the process of the individual evaluation and the results of the testing . . . without any reference to . . . Mantell's report." He also testified that he "could certainly indicate her intellectual abilities, her personality—what the personality tests show, the results of the evaluation itself" without resort to Mantell's report. Anderson then indicated that he would not have worded his second recommendation, the recommendation regarding the father's

ability to contact the respondent and child, as he did without Mantell's report. Anderson indicated that without Mantell's report, he would have had only the respondent's version of the father's actions to consider and so might have had to qualify his recommendation by providing "something like 'based on her report' or some qualification . . . ." At that point, the court interjected, stating: "All right. I've heard enough. . . . Anderson has honestly testified that there are certain matters that are contained in his recommendations, certain conclusions that he has reached, which could not have been reached absent . . . a review of . . . Mantell's report. Accordingly . . . Anderson is excluded from testifying." The respondent subsequently requested that Anderson be allowed to testify about his examination of the respondent, without making reference to the father. The court responded: "I think that the well has been poisoned. My ruling stands. Call your next witness."

The respondent argues that the court abused its discretion when it excluded from evidence Anderson's report and refused to allow Anderson to testify. The petitioner argues that the court acted properly in excluding the evidence in light of the unauthorized disclosure of Mantell's report to Anderson.[10]

"The trial court's exercise of discretion in admitting expert testimony is not to be disturbed unless it has been abused or the error is clear and involves a misconception of the law." (Internal quotation marks omitted.)

---

[10] The petitioner refers to the court's ruling as a "sanction" of the respondent for violating the father's privacy rights. The court did not characterize its ruling as a sanction, however, and the respondent does not appear to have been violating any order of the court at the time she gave the report to her expert. See *Vitone* v. *Waterbury Hospital*, 88 Conn. App. 347, 357, 869 A.2d 672 (2005). Further, the court did not find that there was any intentional wrongdoing involved with the disclosure. We believe it is more accurate to characterize the court's ruling as a remedy, specifically, a remedy for the unauthorized disclosure of the father's confidential information.

*In re Tabitha P.*, 39 Conn. App. 353, 365 n.8, 664 A.2d 1168 (1995). In reviewing the court's determination to exclude the report and testimony, we are mindful that "[t]he psychological testimony from professionals is rightly accorded great weight in termination proceedings." *In re Nicolina T.*, 9 Conn. App. 598, 605, 520 A.2d 639, cert. denied, 203 Conn. 804, 525 A.2d 519 (1987).

Our Supreme Court reviewed a challenge to expert testimony in a termination of parental rights hearing in *In re David W.*, 254 Conn. 676, 691, 759 A.2d 89 (2000). In that case, the court-appointed clinical psychologist, Mantell, had made improper ex parte contact with the department before drafting his fourth, and final, report regarding the respondents' rehabilitation. Mantell subsequently testified for the petitioner at the hearing. The trial court determined that impeachment through cross-examination provided the respondents with a sufficient remedy for the violation and refused to exclude the expert from testifying. Id., 678. On appeal initially to this court, we reversed the judgment terminating the respondents' parental rights, finding that the conflict created by Mantell's testifying for the petitioner, as well as the ex parte contacts, and his role as an independent court-appointed expert mandated the exclusion of his testimony. *In re David W.*, 52 Conn. App. 576, 589–90, 727 A.2d 264 (1999), rev'd, 254 Conn. 676, 759 A.2d 89 (2000). Our Supreme Court reversed this court's judgment. It agreed with the trial court that cross-examination provided a sufficient remedy. The Supreme Court further stated that it would have been *improper* for the court to have excluded the testimony. *In re David W.*, supra, 254 Conn. 691.

Here, the court properly recognized the high importance that this state places on privacy rights regarding psychological examinations. The court also found that the father's privacy rights had been violated without any showing of cause. Therefore, it properly determined

that it should take steps to remedy the injury. In doing so, however, it could have redacted the report to exclude any reference to Mantell's report or even any mention of the father at all. Further, it could have limited any testimony Anderson might have provided to matters regarding the respondent, alone, without reference to the father and based solely on Anderson's evaluations of her. If there was any question as to whether Anderson's conclusions regarding the respondent's ability to benefit from reunification efforts were independent from, or wholly dependent on, Mantell's conclusions, the other parties could have attempted to impeach Anderson through cross-examination, and the court, as the trier of fact, could have assessed the credibility and weight of Anderson's testimony accordingly. See id.

In this case, the court precluded more relevant, and potentially highly important, evidence than was necessary to address the violation of privacy. Anderson did not testify that he based all of his conclusions on the information he gleaned from Mantell's report. Instead, he clearly stated that he would have been able to testify about the results of the evaluations he made of the respondent without regard to the background information in the earlier report. Further, to the extent that Anderson testified that he would have had to alter his report had he not had the information provided by Mantell's report, he indicated that such alterations would have been only as to his second recommendation, which was that the father not be allowed to have contact with the child and the respondent. He did not indicate that his conclusions that the respondent could benefit from reunification efforts and that she should be provided with such services were influenced by Mantell's report.

Because of the importance of the interests involved, namely, the parental rights of the respondent to care, to raise and possibly even to see her child at all, and

the interest of the child in a reasoned and accurate determination of his best interests, we conclude that the court abused its discretion in precluding more evidence than was necessary to remedy the unauthorized disclosure.

The petitioner argues that even if the determination to exclude the entire report and to preclude Anderson from testifying was an abuse of discretion, it was harmless error. The petitioner argues that the ruling was harmless because the only issue before the court was causation of the injury, another witness, McDowell, testified about the respondent's mental condition, and the court did not appear to rely on Mantell's report in making its determination. We do not agree that the preclusion was harmless.

The petitioner is mistaken in asserting that the only issue before the court was causation. The court consolidated the petitions for neglect and for termination of parental rights and held a single hearing to address both. The court was reviewing evidence to determine, among other things, whether the department correctly concluded that it was unnecessary to provide the respondent with reasonable efforts to reunify her and the child. Anderson's recommendation that reunification efforts could be beneficial, and the reasons supporting that recommendation, clearly could be important to a reasoned determination of that issue. Second, the petitioner argues that the evidence would have been cumulative in that the respondent's therapist already had testified about the respondent's mental condition. There is no evidence, however, that the therapist was a licensed psychologist, that she administered evaluations similar to those administered by Anderson or that she had the professional training to do so. Third, there is nothing in the memorandum of decision to indicate that the court discredited the Mantell report or found it trivial. Recognizing the importance generally

accorded to expert testimony in termination of parental rights cases, we conclude that the error was not harmless.[11]

The judgment is reversed with respect to the termination of the respondent mother's parental rights and the case is remanded for a new trial with respect to the mother's parental rights. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

---

[11] We note that although we are reversing the trial court's determination granting the petition for termination of parental rights as to the respondent, this decision does not grant the respondent custody of the child. See *In re Jessica M.*, supra, 217 Conn. 475. We further note that the judgment terminating the father's parental rights is unaltered by this decision.