# IN RE JORDEN R.*
## (AC 28128)

DiPentima, Harper and Stoughton, Js.

Submitted February 1—officially released March 23, 2010

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

*Michael J. Melly,* for the appellant (respondent mother).

*Christopher L. Aker,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, and *Susan T. Pearlman,* assistant attorney general, for the appellee (petitioner).

*Karen Oliver Damboise,* for the minor child.

STOUGHTON, J. This appeal is before us on remand from our Supreme Court. The respondent mother appealed from the judgment of the trial court granting the petition by the petitioner, the commissioner of children and families, to terminate her parental rights as to her minor child, Jorden R.[1] This court reversed the judgment in part. *In re Jorden R.,* 107 Conn. App. 12, 36, 944 A.2d 402 (2008), rev'd in part, 293 Conn. 539, 979 A.2d 469 (2009). Following its grant to the petitioner of certification to appeal, the Supreme Court reversed in part and vacated in part this court's judgment and remanded the case to this court directing it to address the respondent's remaining claim on appeal, namely, that the court improperly found that termination of the respondent's parental rights was in the best interest of the child. See *In re Jorden R.,* 293 Conn. 539, 568, 979 A.2d 469 (2009). We affirm the judgment of the trial court.

---

[1] The child's father consented to the termination of his parental rights during trial and is not involved in this appeal. We therefore refer in this opinion to the respondent mother as the respondent.

The facts relevant to our resolution of the respondent's remaining claim, as set forth by our Supreme Court, are as follows. "The respondent delivered Jorden, a healthy male child, on June 19, 2005. The respondent was sixteen years old and the father was twenty years old at the time of Jorden's birth. A mere five weeks later, on July 24, 2005, Jorden suffered life-threatening and life-altering injuries, which necessitated the department's involvement in this case. . . .

"Jorden's injuries occurred at some point during the night of July 23, 2005, when he was in the exclusive care of his parents. Earlier that day, the father and the respondent, who at the time were living together in the home of the respondent's parents, left Jorden with the respondent's mother while they attended a party where they drank alcohol and smoked marijuana. After the party, at approximately 11 p.m., the couple picked up Jorden and proceeded to the home of the father's grandmother to spend the night. Upon arriving at the grandmother's house, the respondent prepared Jorden's formula, took it to the room in the basement in which they were staying and went to sleep. At that point, Jorden appeared normal. The respondent also did not notice anything unusual about Jorden when she woke to feed and change him at approximately 2 a.m.

"At approximately 10 a.m. the next day, while the respondent was feeding Jorden, she noticed that his hand twitched at ten to fifteen second intervals. She identified the twitching as a cause for concern and telephoned her mother for advice. The respondent called her mother multiple times because the twitching continued throughout the day. The respondent and her mother eventually agreed to meet for dinner, at which time they would evaluate Jorden.

"When the father and the respondent brought Jorden to the respondent's parents' home at approximately 7

p.m., Jorden was twitching actively. The respondent's mother inspected Jorden, noticed swelling in the region of his right temple, and told the parents to take Jorden to the emergency room at the hospital. The respondent and the father complied and brought Jorden to the emergency room—ten hours after the respondent first noticed the twitching. There was testimony at trial that this delay likely compromised Jorden's medical treatment.

"Immediately after the couple arrived at the hospital with Jorden, an emergency room nurse realized the baby was having seizures and called for a physician, who observed that Jorden was suffering from clonic tonic seizures, facial and body twitching and eye deviation. Jorden's seizures were related to intracranial injuries, which, according to the medical staff treating him, likely had occurred within the previous twenty-four to forty-eight hours. A hospital emergency room physician opined at trial that Jorden's symptoms were consistent with shaken baby syndrome. The physician stated that Jorden's internal head injuries had occurred either from a blow to the head or from having been severely shaken and that the bruise was the 'result of a blow.' The physician further noted that [Jorden's] skull and clavicle fractures, coupled with the unexplained mechanics of the injury, were 'all red flags for abuse and nonaccidental trauma.' " Id., 544–46.

"The commissioner subsequently filed the neglect petition and sought temporary custody of Jorden, citing his severe and unexplained physical injuries. See General Statutes § 46b-129 (b). In connection with its order granting temporary custody of Jorden to the commissioner, the trial court ordered, and the department thereafter provided to the parents, specific steps to facilitate reunification. See General Statutes § 46b-129 (d) (6). Those steps called for the respondent, inter alia, to '[p]articipate in counseling and make progress

toward . . . identified treatment goals . . . .' One of those goals was for the respondent to deal with issues such as her own history of abuse by the father and his probable battery of their child." *In re Jorden R.*, supra, 293 Conn. 547.

The record reflects that the respondent and the father had a stormy relationship, and that "[d]espite the father's aggressive and abusive behavior and the couple's multiple breakups, the respondent was vulnerable to the father's 'sweet talk' and repeatedly reconciled with him. Indeed, the respondent and the father broke up for a brief period following Jorden's injuries. The respondent eventually took the father back, however, even though she suspected that he was Jorden's abuser and even though it was contrary to the court-ordered specific steps.

"Notwithstanding the fact that reunification efforts were underway pursuant to the specific steps ordered by the court in connection with the order of temporary custody, the commissioner, on October 27, 2005, filed a petition to terminate parental rights, which stated that the respondent and the father were unable or unwilling to benefit from reunification efforts. . . . Following a trial, the court terminated the rights of both parents pursuant to [General Statutes] § 17a-112 (j). Pursuant to the statute, the trial court found . . . that termination of the parents' rights was in Jorden's best interest." Id., 548–49.

On appeal, the respondent claims that the court improperly found that termination was in the best interest of the child. Specifically, she claims that the decision of the court to terminate her parental rights was against the weight of the evidence and clearly erroneous. We disagree.

"Our standard of review on appeal from a termination of parental rights is limited to whether the challenged

findings are clearly erroneous. . . . A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made." (Citation omitted; internal quotation marks omitted.) *In re Gabrielle M.*, 118 Conn. App. 374, 376, 983 A.2d 282 (2009).

"On appeal, our function is to determine whether the trial court's conclusion was factually supported and legally correct. . . . In doing so, however, [g]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence." (Internal quotation marks omitted.) *In re Davonta V.*, 285 Conn. 483, 488, 940 A.2d 733 (2008). Accordingly, "every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) Id.

Having determined that grounds for termination of the respondent's parental rights existed, the court proceeded to the dispositional phase of the hearing, during which it determined that termination was in the best interest of the child.[2] This determination must be supported by clear and convincing evidence. Id., 487–88. Additionally, in reaching its determination, the court was required to consider and make written findings regarding seven factors delineated in § 17a-112 (k). See *In re Tabitha P.*, 39 Conn. App. 353, 362, 664 A.2d 1168 (1995). "There is no requirement that each factor be proven by clear and convincing evidence." (Internal

[2] "A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights [under § 17a-112 (j)] exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Internal quotation marks omitted.) *In re Gabrielle M.*, supra, 118 Conn. App. 376.

quotation marks omitted.) *In re Janazia S.*, 112 Conn. App. 69, 98, 961 A.2d 1036 (2009).

In this case, the court considered and made written findings concerning each of the seven factors mandated by statute and concluded that termination was in the best interest of the child. Furthermore, the court properly examined all of the evidence before it and reached the following conclusions: "With respect to the best interests of the child . . . the court finds that termination of the parental rights . . . is in the best interest of the child. Permanency, consistency, affection and stability are crucial for Jorden. The biological parents are incapable of providing the quotidian warmth, affection, consistency, stability and mature care that this special needs child will need throughout his life.

"In finding that termination of the respondents' parental rights would be in the child's best interest, the court has examined multiple relevant factors including the child's interests in sustained growth, development, well-being and stability; his length of stay in foster care; the nature of his relationship with foster parents and biological parents; the degree and quality of contact maintained with his biological parents; and his genetic bond to [his biological parents].

"The court has also balanced the child's intrinsic need for stability and permanency against the potential benefit of maintaining a connection with his biological parents. . . . Under such scrutiny, the clear and convincing evidence in this matter establishes that termination of . . . parental rights is in Jorden's best interest." (Citation omitted.) We conclude that these findings are all adequately supported by the evidence in the record and are not clearly erroneous.

The respondent, however, not only challenges the factual findings themselves but also the weight assigned to them by the court. It is not our function to weigh

the evidence or to examine the record to determine whether another trier of fact might have reached a different conclusion. See *In re Gabrielle M.*, supra, 118 Conn. App. 377. There is extensive evidentiary support for the court's finding that termination of the respondent's parental rights is in the best interest of the child, and we will not substitute our evaluation of the evidence for that of the trial court.

The judgment is affirmed.

In this opinion the other judges concurred.